**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| BRENDA DANIELLE REPRIETO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | 1:24-CV-01074-ELR |
| | * | |
| CHEROKEE COUNTY SCHOOL | * | |
| DISTRICT, et al., | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |

_____

**ORDER**

_____

Presently before the Court are two Motions to Dismiss—one by Defendants Kyla Cromer, Robert Reichsteiner, Kelly Poole, Patsy Jordan, John Harmon, Clark Menard, and Mike Chapman [Doc. 33] and the other by Defendants Brian Hightower, Buster Cushing, Richard Rich, Brad DeWoody, and Cherokee County School District [Doc. 34]. The Court sets forth its reasoning and conclusions below.

# I.    Background[1]

Defendant Cherokee County School District ("CCSD") is a school district that operates the public schools of Cherokee County by and through the Cherokee County Board of Education (the "School Board"), which is composed of seven members. Compl. ¶ 2 [Doc. 1]. Those members are Defendant Cromer, the Chair of the School Board; Defendant Rechsteiner, the Vice Chair of the School Board; and Defendants Poole, Jordan, Harmon, Menard, and Chapman. Id. ¶¶ 3–5. As part of their responsibilities, the School Board holds monthly public meetings ("School Board meetings"), which include a public comment period. Compl. ¶ 18; O.C.G.A. § 20-2-58. To govern these meetings, the School Board adopted a "Public Participation in Board Meetings" policy (the "Public Participation Policy"), which sets forth the following rules and procedures for public participation:

1. The speaker will state his/her name and address (address only if response requested (sic)).

2. All remarks will be made to the School Board as a body and not to an individual School Board member.

3. No person will be allowed to make obscene, derogatory or slanderous remarks while addressing the School Board. Any School Board member may stop comments.

4. No person will be allowed to disrupt or interfere with procedures.

---

[1] For purposes of Defendants' Motions to Dismiss, the Court "accept[s] the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff." Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003).

5. Remarks will end when the speaker's allotted time has expired.

6. Questions from School Board members or the Superintendent may be asked for clarification; however, no person from the floor will be permitted to enter into any discussion either directly or through any member of the School Board.

Id. ¶ 19.

Brenda Danielle Reprieto is a CCSD substitute teacher and the mother of a child who attends a CCSD school. Id. ¶¶ 1, 22, 27. Reprieto is an involved parent who has attended numerous School Board meetings and participated in the public comment period multiple times. Id. ¶ 27. In 2022, Reprieto, as well as various other parents, grew increasingly concerned that children in CCSD schools were being exposed to books containing "adult subjects such as pornography" in CCSD libraries. Id. ¶ 23. Numerous parents raised the issue of "pornographic materials" during School Board meetings without satisfactory resolution. Id. ¶ 29.

On March 17, 2022, the School Board convened a public meeting, and "a number of concerned parents" signed up to speak about the CCSD library books. See id. ¶¶ 30, 32. Plaintiff attended the meeting "in support" of those who had signed up to speak and "to let the Board know that she opposed obscene and pornographic materials being made available to minor children." Id. ¶ 32. However, the Complaint contains no allegation that Plaintiff herself signed up to speak. See generally id.

As planned, during the meeting "numerous" parents made comments criticizing the School Board's inaction regarding certain books. Id. ¶¶ 34–35. One

parent raised concerns about the book "Homegoing," and read the following section from it: "Excited now, he pushed into her. As she squeezed her eyes as tightly as she could, her tongue circled her lips. He pushed harder, his breath heavy and labored. She scratched his back and he cried out. She bit his ear and pulled his hair." Id. ¶ 35. Before the parent could finish speaking, School Board Member Jordan said, "Excuse me. We have children at home. And it's really not appropriate." Id. ¶ 36. The parent replied, "Don't you find the irony in that? You're saying exactly what I'm telling you! You're giving this to our children! I would never give this to children." Id. ¶¶ 37–38. School Board Chair Cromer said, "Out of order. Thank you." Id. ¶ 39. Reprieto replied, "That's the point!" Id. ¶ 40.

Later in the meeting, Cromer spoke to the seated audience about the CCSD library books. See id. ¶ 41; [Doc. 36]. Video footage[2] of the meeting portrays the following exchange as Cromer spoke and audience members, including Reprieto, who was seated in the fifth row, shouted from their seats.

> **Cromer:** Any other School Board members with some thoughts? I'm going to follow up with a couple of the speakers that were just speaking. Three of them were talking about the school library and the challenges that we have to our assignments and to books. And as a parent, I can appreciate that you have that in your heart and that is something that you want to control what you child is exposed to. That is your job as a parent, I get it.

---

[2] As discussed infra Part IV.A., the Court may consider this footage at the motion to dismiss stage pursuant to the doctrine of incorporation.

. . . I also wanted to say that while you have that ability for your child, I don't know if you have that ability to prevent other children from accessing books or materials or assignments. And what you're asking to do is for us to take some of this stuff out of the hands of every child . . ."

**Various audience members (speaking over Cromer):** "Yes!" "Yes!" "Yes!" "Yes, we are!"

**Cromer:** ". . . in our district . . ."

**Various audience members (speaking over Cromer):** "Yes!"

**Cromer:** ". . . and that, that is . . ."

**Reprieto (shouting):** "You should be arrested!"

**Cromer:** "No! Excuse me, you could be removed. Now . . ."

**Reprieto (while pointing at the Board Members):** "You should be arrested. Every one of you."

**Cromer (speaking over Reprieto):** "No, so . . . Point of order."

**Cromer:** "Thank you. I'm just saying that you don't get to tell what other parents get to have their kids have access to. So, thank you. That's it. We're working through the process. We are working through the process. Thank you. Moving on."

[Doc. 36 at 3:50–6:03].[3]

---

[3] Reprieto alleges that she said "you should be arrested" only once. Compl. ¶ 43. She also alleges that her remark "did not disrupt the meeting, did not interfere in any way with [Cromer's] ability to address the meeting, and did not interfere with any other speaker." Id. ¶ 45. However, the video footage of Reprieto's statements plainly contradicts Reprieto's alleged version of events. [See Doc. 36 at 5:31–6:00]. Thus, the Court accepts the video's depiction of those interactions instead of the Complaint's account. See Baker v. City of Madison, Ala., 67 F.4th 1268, 1277–78 (11th Cir. 2023).

Following Reprieto's statements, School Board Vice Chair Rechsteiner and School Board Member Menard gestured to several CCSD safety officers, directing them to Reprieto. Compl. ¶ 45. Two of those safety officers walked over to Reprieto and spoke with Reprieto for a full minute until a third officer approached. [Doc. 36 at 5:42–7:10]. The three officers—Rich, Cushing, and DeWoody—spoke with Reprieto for approximately another two minutes. [Id. at 7:10–9:00].

According to the Complaint, the officers "demand[ed] that [Reprieto] exit the meeting room." Compl. ¶ 47. Reprieto objected, saying that she had done nothing wrong and wanted to continue attending the meeting, but the officers "closed in on her," and "out of fear for her safety and freedom," Reprieto exited the room. Id. ¶ 48. As Reprieto exited, video footage shows her pointing towards the School Board members and again saying, "You should be arrested," as well as other unintelligible words. [Doc. 36 at 8:55–9:05]. Several audience members filmed this event on their phones. Compl. ¶ 50. Once Reprieto exited, the officers told her that she could not reenter the meeting, that she was trespassing on CCSD property, and instructed her to leave the premises. Id. ¶ 49.

The next day, on March 18, 2022, Reprieto showed up to work as a substitute teacher at a CCSD high school. Id. ¶ 52. While she was working, she received an email from "agents of CCSD" telling her that all her future assignments were canceled and that her access to the computer scheduling system for substitute

teachers was terminated. Id. ¶¶ 52, 72. Several days later, on March 23, 2022, she received a certified letter containing a Criminal Trespass Warning from Officer Rich that excludes her from all CCSD properties with no exceptions or expiration date. Id. ¶¶ 54–55, 97. The Criminal Trespass Warning is dated March 17, 2022. Id. at 28.

Subsequently, Reprieto retained an attorney who wrote to CCSD to challenge the scope of the Criminal Trespass Warning. Id. ¶ 57. A CCSD attorney responded with a letter permitting Reprieto to be present on CCSD grounds to vote when her voting precinct is in CCSD schools, and to attend her child's school events. Id. ¶ 58. However, the letter did not otherwise lift the Criminal Trespass Warning. Id. Thus, Reprieto remains subject to the possibility of arrest if she enters any CCSD property for any other purpose without written permission. Id. ¶ 59. Consequently, she is effectively prohibited from attending and speaking at all CCSD Board meetings. Id. ¶ 60.

## II. Procedural History

Plaintiff Reprieto brings this action against each of the seven School Board members—Defendants Cromer, Rechsteiner, Poole, Jordan, Harmon, Menard, and Chapman—in their official and individual capacities, and three CCSD safety officers—Defendants Rich, Cushing, and DeWoody—in their official and individual capacities. See Compl. ¶¶ 3–5, 7–9. Plaintiff also brings this suit against Defendant

Hightower, the superintendent of CCSD, in his official and individual capacities, and against Defendant CCSD. Id. ¶¶ 2, 6.

Plaintiff alleges two § 1983 claims against all Defendants. First, Plaintiff alleges that Defendants violated her First Amendment right of free speech by "discriminating and retaliating against her on the basis of the content of her speech – her opinion that Chair [] Cromer should be jailed." Id. ¶ 78. Second, Plaintiff alleges that Defendants failure to provide her with a pre-deprivation or post-deprivation hearing in relation to the Criminal Trespass Warning and her employment termination violates her procedural due process rights under the Fourteenth Amendment. See id. ¶¶ 104–06. Id. ¶ 107. Plaintiff seeks damages, declaratory and injunctive relief, and attorney fees. Id. ¶¶ 84, 110.

Defendants Cromer, Reichsteiner, Poole, Jordan, Harmon, Menard, and Chapman filed a Motion to Dismiss the Complaint under Rule 12(b)(6), [Doc. 33],

and Defendants Hightower, Cushing, Rich, DeWoody, and CCSD did the same.

[Doc. 34]. Both motions have been fully briefed and are ripe for the Court's review.[4]

## III.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain

sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible

on its face.'" See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 570 (2007)). Put differently, a plaintiff must plead

"factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." See id. This so-called "plausibility

standard" is not akin to a probability requirement; rather, the plaintiff must allege

sufficient facts such that it is reasonable to expect that discovery will lead to

evidence supporting the claim. See id.

---

[4] Plaintiff's response briefs fail to comply with Local Rule 5.1. Specifically, Local Rule 5.1(C) requires that motions be double-spaced between lines and that computer documents filed with the court be prepared using one of the specified fonts and points. See LR 5.1, NDGa. It appears that Plaintiff used "exact" or "true" double spacing, rather than a word processing program's default double spacing, which allows for more lines on each page and creates an unfair advantage. [See Docs. 39; 40]. Where a party submits documents prepared using a standard word processing program such as Microsoft Word, as Plaintiff appears to have done, it is "common sense" for the opposing party and the Court to expect that the party prepared the filing using the standard double-spacing format designated by that program (e.g., Microsoft Word). See Doubleday Acquisitions LLC v. Envirotainer AB, No. 1:21-CV-03749-SCJ, 2022 WL 18777366, at *3–4 (N.D. Ga. July 1, 2022) (agreeing with the "common sense" approach and interpreting Local Rule 5.1's double-spacing requirement to mean "a word processing program's default double spacing, not exact spacing"). To the extent a party intends to deviate from the Court's interpretation of the Local Rules' requirements, it must seek leave in advance. The Court cautions Plaintiff that if she fails to comply with Local Rule 5.1(C) again, the Court may decline to consider any noncompliant motions or briefs. See LR 7.1(F), NDGa.

When considering a 12(b)(6) motion to dismiss, the Court must accept as true the allegations set forth in the complaint, drawing all reasonable inferences in the light most favorable to the plaintiff. See Twombly, 550 U.S. at 555–56; United States v. Stricker, 524 F. App'x 500, 505 (11th Cir. 2013) (per curiam). However, the Court is "not required to credit conclusory allegations, unwarranted deductions of facts[,] or legal conclusions masquerading as facts." Patton v. Carnival Corp., No. 22-13806, 2024 WL 1886504, at *2 (11th Cir. Apr. 30, 2024). To that end, the Court "may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." Id. (quoting Doe v. Samford Univ., 29 F.4th 675, 686 (11th Cir. 2022)).

In sum, a complaint offering mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient. See Iqbal, 556 U.S. at 678 (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 555). Rather, "a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief" so as to satisfy "the pleading requirements of Rule 8." See Parker v. Brush Wellman, Inc., 377 F. Supp. 2d 1290, 1294 (N.D. Ga. 2005) (citing Fed. R. Civ. P. 8(a)(2)).

## IV.    Discussion

The Court begins by addressing the scope of materials it will consider for purposes of Defendants' Motions to Dismiss. Next, the Court addresses Plaintiff's official capacity claims before turning to Plaintiff's First Amendment retaliation and Fourteenth Amendment procedural due process claims.

### A.    Scope of Materials the Court May Consider

Defendants attach a ten-minute video of the relevant School Board meeting as Exhibit A to their motions to dismiss. [See Docs. 33 at 3; 34 at 3; 36]. In response, Plaintiff states that she challenges "the accuracy, relevance, and admissibility" of the video. [Docs. 40 at 5; 41 at 5]. Additionally, Plaintiff filed an "Objection to Evidence," by which she argues that the evidence is unauthenticated pursuant to the Federal Rules of Evidence and is not integral to Plaintiff's claims. [Doc. 43 at 2–3]. In response, Defendants filed a business record certification for the video. [Doc. 44-1]. Plaintiff did not file a reply.

"Under the incorporation-by-reference doctrine, a district court may consider evidence attached to a motion to dismiss without converting the motion into a motion for summary judgment 'if the document is (1) central to the plaintiff's claim; and (2) undisputed, meaning that its authenticity is not challenged.'" Swinford v. Santos, 121 F.4th 179, 186 (11th Cir. 2024) (quoting Johnson v. City of Atlanta, 107 F.4th 1292, 1300 (11th Cir. 2024)). A plaintiff may dispute the authenticity of video

footage by arguing that it has been "altered" or contending "that what the footage depicts differs from what actually happened." Id. at 188 (citing Baker v. City of Madison, Ala., 67 F.4th 1268, 1277 (11th Cir. 2023).

Here, the video plainly depicts the events that are central to Plaintiff's claims. The video shows the statements that Plaintiff made and the interactions that Plaintiff points to as the basis for her claims. [See Doc. 36]. Further, besides Plaintiff's conclusory statement that she contests the "accuracy" of the video, she does not assert that "the footage has been altered in any way," nor does she contend "that what the footage depicts differs from what actually happened." Baker, 67 F.4th at 1277. Notably, Plaintiff does not dispute that the video depicts her voice and likeness. She does not dispute that the video shows the relevant School Board meeting. And she does not contend that the video falsely portrays her or anyone else involved in a manner that does not reflect what actually happened. In other words, she does not contend that the video shows a false depiction of the events. Further, Plaintiff did not respond to or challenge the business record certification that Defendants filed in support of the video. In sum, Plaintiff has identified no persuasive reason for the Court to doubt the video's authenticity.

Therefore, because the video is central to Plaintiff's claims and its authenticity is unchallenged, the Court may consider it under the doctrine of incorporation. See Swinford, 121 F.4th at 186. In doing so, the Court is mindful that videos do not

always "paint the entire picture" of an event and "may contain ambiguities that are subject to interpretation." <u>Baker</u>, 67 F.4th at 1277. When portions of a video are ambiguous or incomplete, the Court "must construe all ambiguities in the video footage in favor of the plaintiff," just as the Court "must, at this stage, construe all ambiguities in the written pleadings in the plaintiff's favor." <u>Id.</u>

However, where portions of the video are "clear and obviously contradict the plaintiff's alleged facts," the Court must "accept the video's depiction instead of the complaint's account, and view the facts in the light depicted by the video." <u>Id.</u> at 1277–78 (cleaned up). "After all, courts are not required to rely on 'visible fiction.'" <u>Id.</u> at 1278 (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 381 (2007)). Therefore, when reviewing Defendants' motions to dismiss, the Court credits the Complaint's factual allegations "where no obviously contradictory video evidence is available." <u>Id.</u> at 1278. But where the footage plainly contradicts Plaintiff's alleged version of events, the Court views the facts as depicted by the video. <u>Id.</u>

### B.    The Official Capacity Claims

Defendants Cromer, Rechsteiner, Poole, Jordan, Harmon, Menard, and Chapman (the "School Board Defendants") argue that Plaintiff's claims against them in their official capacity are due to be dismissed. The Court agrees. An "official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Therefore, Plaintiff's claims

against the School Board Defendants in their official capacity are, in effect, claims against the School Board. Id. However, the Georgia Supreme Court has held that a county school board, "unlike the school district which it manages, is not a body corporate and does not have the capacity to sue or be sued." Cook v. Colquitt Cnty. Bd. of Educ., 412 S.E.2d 828, 828 (Ga. 1992). Thus, the Court dismisses Plaintiff's official capacity claims against the School Board Defendants.[5]

Additionally, Defendants Hightower, Cushing, Rich, and DeWoody (the "School District Employee Defendants") argue that Plaintiff's official capacity claims against them are subject to dismissal. The Court agrees again. The Complaint alleges that each of the School District Employee Defendants were employees of CCSD at the time of the Complaint. See Compl. ¶¶ 6–9. Therefore, Plaintiff's claims against the School District Employee Defendants are, in effect, claims against CCSD. See Graham, 473 U.S. at 166. Because the Complaint asserts identical claims against CCSD, the Court dismisses Plaintiff's official capacity claims against the School District Employee Defendants as duplicative. See Haugabrook, 2010 WL 4823485, at *3.

---

[5] Alternatively, to the extent that Plaintiff's official-capacity claims against the School Board Defendants could be construed as claims against CCSD, such claims are due to dismissal as duplicative of Plaintiff's claims against CCSD. See Haugabrook v. Cason, No. 7:10-CV-60-HL, 2010 WL 4823485, at *2–3 (M.D. Ga. Nov. 22, 2010)

### C.    First Amendment Retaliation Claim

Plaintiff brings a First Amendment retaliation claim against all Defendants, alleging that Defendants retaliated against her based on the content of her speech by removing her from the School Board meeting, issuing the Criminal Trespass Warning, and terminating her employment as a substitute teacher. See Compl. ¶¶ 70–83. The Court first discusses why Plaintiff's claim against Defendant CCSD is due to be dismissed and then addresses Plaintiff's individual capacity claims against the remaining Defendants.

### 1.    Plaintiff's claim against Defendant CCSD

Defendant CCSD argues that Plaintiff fails to state a claim against it under Monell v. Department of Social Services, 436 U.S. 658 (1978). The Court agrees. In Monell, the United States Supreme Court held that a local government entity cannot be held liable under § 1983 using a *respondeat superior* theory for injuries caused solely by its employees. Id. at 694. Instead, to state a § 1983 claim against a local government entity, such as CCSD, a plaintiff must identify a specific deprivation of federal rights and the local government policy or custom that caused the deprivation of federal rights. Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 404 (1997).

A plaintiff can satisfy the policy or custom requirement by showing her constitutional violations resulted from one of the following: (1) an express policy of

the municipality; (2) a custom or practice so well-settled and pervasive it assumes the force of law; or (3) the actions of an official with final policymaking authority. Cuesta v. Sch. Bd. of Miami–Dade Cnty., 285 F.3d 962, 966 (11th Cir. 2002); Denno v. Sch. Bd. of Volusia Cnty., 218 F.3d 1267, 1276 (11th Cir. 2000). Whether a particular official has final policymaking authority is a question of state law. Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1480 (11th Cir. 1991).

### a. Express policy or pervasive custom or practice

Plaintiff cannot point to an express policy that violated her rights under the First Amendment. Rather, Plaintiff alleges that the Public Participation Policy (the only express official policy mentioned in the Complaint) does *not* permit Defendants to act in the manner in which they allegedly violated her constitutional rights.[6] See Compl. ¶¶ 102–03 (alleging that the Public Participation Policy "contains no authority to exclude a member of the public from the public meeting" or from "all CCSD property for a short or long term").

Plaintiff also fails to identify an informal custom or practice "so well-settled and pervasive it assumes the force of law" that violated her rights. See Denno, 218 F.3d at 1277. Although the Complaint alleges that CCSD has "a policy, custom and/or practice" of (1) "shutting down comments involving subjects critical to the

---

[6] Plaintiff does not allege or argue that the Public Participation Policy gives Defendants' unbridled discretion or that it is arbitrarily enforced.

Board and its members"; (2) "using uniformed security officers to intimidate and eject public participants in its monthly meeting who talk about difficult subjects unwelcomed by the Board"; and (3) "using criminal trespass warnings to exclude and terminate the opportunities for members of the public who make unwelcome comments that are critical of Board actions," Plaintiff "fails to identify any examples" of "widespread unconstitutional conduct" beyond her own alleged incident. Gurrera, 657 F. App'x at 893; Compl. ¶¶ 86–88. "This one instance falls far short of showing there was a widespread practice or custom." Chaney v. Fayette Cnty. Pub. Sch. Dist., 977 F. Supp. 2d 1308, 1318–19 (N.D. Ga. 2013). Thus, setting aside the Complaint's conclusory allegations of informal policies, the Complaint fails to allege an unofficial custom or practice as the moving force behind the alleged deprivation of Plaintiff's rights. See Gurrera, 657 F. App'x at 893 (affirming the dismissal of a § 1983 claim against a municipality where the complaint did not plausibly support the plaintiff's conclusory allegations of the municipality's pattern of wrongful conduct); see also Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1329 (11th Cir. 2015) (citing Iqbal, 556 U.S. at 678 ("[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'")).

b.    *Actions of an official with final policymaking authority*

Municipal liability may be imposed for a single decision or action by a municipal official with final policymaking authority when the official's actions "or

edicts may fairly be said to represent official policy." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986). Additionally, "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." <u>Id.</u> An official does not have final policymaking authority over particular functions if his decisions are "subject to meaningful administrative review." <u>Scala v. City of Winter Park</u>, 116 F.3d 1396, 1401 (11th Cir. 1997). However, if the "authorized policymakers approve a subordinate's decision and the [unconstitutional] basis for it, their ratification would be chargeable to the municipality because their decision is final." <u>See</u> <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988); <u>Matthews v. Columbia Cnty.</u>, 294 F.3d 1294, 1297 (11th Cir. 2002).

Whether a particular official has final policymaking authority is a question of state law. <u>Brown v. City of Fort Lauderdale</u>, 923 F.2d 1474, 1480 (11th Cir.1991). The Complaint alleges that the School Board has the role of legislating CCSD's policies. Compl. ¶ 2. Indeed, Georgia law explicitly confines control and management of a school district to the county board of education, O.C.G.A. § 20-2-50, and "a county board is without power to delegate its authority to manage the affairs of the school district." <u>State Bd. of Educ. v. Elbert Cnty. Bd. of Educ.</u>, 146 S.E.2d 344, 348 (Ga. Ct. App. 1965). In fact, a county board of education "has no authority, by contract or otherwise, to delegate to others the duties

placed on the board by the Constitution and laws of Georgia." <u>Chatham Ass'n of Educators v. Bd. of Pub. Educ.</u>, 204 S.E.2d 138, 139–40 (Ga. 1974). Because policymaking authority rests with the School Board as an entity, CCSD can only be subject to liability if the School Board "itself acted with an unconstitutional motive." <u>Matthews</u>, 294 F.3d at 1297. "An unconstitutional motive on the part of one member of [the School Board] is insufficient to impute an unconstitutional motive to the [School Board] as a whole." <u>Id.</u> Therefore, to state a claim of liability against CCSD, Plaintiff must allege that the School Board as an entity—as the final policymaker—undertook, delegated, or ratified the actions causing the alleged violation of Plaintiff's constitutional rights. <u>See</u> <u>Chaney v. Fayette Cnty. Pub. Sch. Dist.</u>, 977 F. Supp. 2d 1308, 1319 (N.D. Ga. 2013). In their respective motions, the School Board Defendants and CCSD argue that Plaintiff fails to do so for two reasons. [Docs. 33 at 18–19; 34 at 12–14].

First, Defendants argue that the Complaint is devoid of any plausible allegations that any School Board members undertook, delegated, or ratified (1) the removal of Plaintiff from the School Board meeting because of any alleged protected speech, (2) the issuance of any criminal trespass warning, or (3) the termination of her substitute teacher contract. [Docs. 33 at 18–19]. Second, Defendants argue that even assuming that *some* Board Members acted with an unconstitutional motive at some point, Plaintiff has not alleged that all of the Board Members shared that

motive. [Doc. 34 at 12]. In response, Plaintiff does not squarely address Defendants' arguments. Instead, she only argues that she has adequately alleged informal policies and practices—an argument which the Court rejects above. [See Docs. 49 at 14–15; 40 at 14–15].

The Court agrees with Defendants that Plaintiff fails to state a claim for municipal liability against CCSD. The Complaint alleges that, in response to Plaintiff's statements during the School Board Meeting, Defendant Cromer stated, "You *could* be removed," Compl. ¶ 44 (emphasis added), and Defendants Rechsteiner and Menard subsequently "gestured to the security officers present, directing them to Plaintiff." Id. ¶ 46. Defendants Rich, Cushing, and DeWoody then "surrounded Plaintiff, demanding that she exit the meeting room." Id. ¶ 47. Plaintiff ultimately left the meeting room. Id. ¶ 48. From there, Defendants Rich, Cushing, and DeWoody told Plaintiff that she was not allowed to reenter the meeting and that she was trespassing on CCSD property, and they demanded that she leave. Id. ¶ 49. The next day, Plaintiff received an email from "agents of CCSD" telling her that her substitute teacher assignments had been canceled, id. ¶¶ 52, 72, and several days later, she received a Criminal Trespass Warning from Defendant Rich. Id. at 28.

At best, these allegations permit an inference Defendants Rechsteiner and Menard directed Defendants Rich, Cushing, and DeWoody to approach Plaintiff and demand that she leave the School Board meeting. Even assuming without deciding

that Defendants Rechsteiner and Menard acted with an unconstitutional motive by directing Defendants Rich, Cushing, and DeWoody to demand Plaintiff to leave based on her viewpoint, the Complaint does not allege that any of the other Board Members were involved in that action or that they embraced Defendants Rechsteiner and Menard's alleged unconstitutional motive. Further, the Complaint is devoid of any allegations that the School Board Defendants voted on, directed, or ratified the issuance of the Criminal Trespass Warning by Defendant Rich or the decision by "agents of CCSD" to terminate Plaintiff's position as a CCSD substitute teacher. See ¶¶ 72–73.

Simply put, the Complaint fails to plausibly allege that the School Board, as an entity, undertook, delegated, or ratified the actions causing the alleged violation of Plaintiff's constitutional rights or any other basis to state a plausible Monell claim against Defendant CCSD. Accordingly, the Court dismisses Plaintiff's claims against Defendant CCSD. Phoenix Ridge GA TC, LP v. City of Atlanta, Georgia, No. 24-12883, 2025 WL 831248, at *2–3 (11th Cir. Mar. 17, 2025) (affirming the dismissal of a Monell claim where the complaint did not allege an official policy, an unofficial custom or practice, or that any relevant individual had final policymaking authority).

### 2.    The individual capacity claims

#### a.    *Defendants Hightower, Poole, Jordan, Harmon, Chapman, and Cromer*

The Complaint is devoid of any substantive allegations about Defendants Hightower, Poole, Jordan, and Harmon. See generally Compl. The only allegations in the Complaint that mention these Defendants simply assert that Defendant Hightower was the superintendent of CCSD and Defendants Poole, Jordan, Chapman, and Harmon were School Board members at all times relevant to the Complaint. Id. ¶¶ 5–6. Further, Plaintiff's responses to Defendants' Motions to Dismiss contain no specific mention or argument about these Defendants. [Docs. 39; 40]. Similarly, the Complaint is devoid of any allegations about Defendant Cromer engaging in any wrongful conduct. Plaintiff only alleges that Defendant Cromer told Plaintiff that she "*could* be removed." Compl. ¶ 44 (emphasis added). The Complaint does not allege any facts showing that Defendant Cromer was involved in Plaintiff's removal from the School Board meeting, Plaintiff's Criminal Trespass Warning, or Plaintiff's termination of employment. See generally id.

Accordingly, because the Complaint contains no factual allegations to support a plausible inference that Defendants Hightower, Poole, Jordan, Chapman, Harmon, or Cromer engaged in any wrongful conduct, the Court dismisses Plaintiff's First Amendment retaliation claim against them in their individual capacities.

> b. *Defendants Cushing, Rich, DeWoody, Reichsteiner, and Menard*

Defendants Cushing, Rich, DeWoody, Reichsteiner, and Menard each argue that the Complaint fails to state a First Amendment retaliation claim against them.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." Nieves v. Bartlett, 587 U.S. 391, 398 (2019). "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." Id. (cleaned up). "To prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" Id. (citation omitted). The official's retaliatory motive must be "but-for" cause of the plaintiff's injury, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive. Id.

Plaintiff claims that Defendants took the following allegedly adverse actions in retaliation for her comment that Defendant Cromer "should be arrested": (1) Defendants Rechsteiner and Menard "gestured" to Defendants Rich, Cushing, and DeWoody, who demanded that Plaintiff exit the School Board meeting room and escorted her out; (2) "agents of the CCSD" terminated Plaintiff's employment as a substitute teacher with the CCSD the next day; and (3) six days after Plaintiff's

speech, Plaintiff received a Criminal Trespass Warning in the mail, which was issued by Defendant Rich on the day of the School Board meeting. Compl. ¶¶ 46, 48, 70–83; id. at 28.

As to the second alleged adverse action, Plaintiff's termination, the Complaint contains no allegations that Defendants Cushing, Rich, DeWoody, Reichsteiner, or Menard terminated Plaintiff's employment as a substitute teacher at CCSD. See generally id. Thus, to the extent that Plaintiff claims that her termination was an adverse action taken in retaliation for her speech, the Complaint "lacks sufficient factual matter" to support a plausible inference that any of those Defendants took part in Plaintiff's termination. Iqbal, 556 U.S. at 678.

As to the first alleged adverse action, Plaintiff's removal from the School Board meeting, it is a matter of "common sense that a government body should be allowed to remove people who are disrupting a public meeting." Youkhanna v. City of Sterling Heights, 934 F.3d 508, 523 (6th Cir. 2019). Here, the video footage shows that Plaintiff spoke out-of-turn as an audience member when she shouted, "You should be arrested!" during Defendant Cromer's remarks and twice interrupted her, resulting in Defendant Cromer warning her that she could be removed and calling out "point of order." [Doc. 36]. In doing so, Plaintiff violated the Public Participation

Policy—which sets out procedural requirements for speakers and prohibits disruptive conduct.[7] See Compl. at 26–27.

In limited public forums—such as the School Board meeting[8]—the government may impose restrictions on speech that are viewpoint-neutral and "reasonable in light of the purpose served by the forum." McDonough, 116 F.4th at 1328. Here, removing Plaintiff for disruptive conduct and for failing to comply with the Policy's procedural requirements is a viewpoint-neutral and reasonable restriction in light of the "strong government interest in preserving decorum at board meetings." See Dyer v. Atlanta Indep. Sch. Sys., 426 F. Supp. 3d 1350, 1359 (N.D. Ga. 2019) (cleaned up) (collecting cases), aff'd, 852 F. App'x 397 (11th Cir. 2021). After all, "[u]nstructured, chaotic school board meetings not only would be

---

[7] The Public Participation Policy mandates that an individual who wishes to speak at a School Board meeting "must provide their name, address, email address[,] and phone number" prior to speaking. Compl. at 26. Only after being "called to speak" or otherwise "recognize[d]" by the School Board chair may a visitor then speak for an allotted time period. See id. The Public Participation Policy also provides that, "[n]o person will be allowed to disrupt or interfere with procedures." Id. at 27.

[8] The Constitution "does not require the government to 'grant access to all who wish to exercise their right to free speech,' no matter the setting, 'without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.'" McDonough v. Garcia, 116 F.4th 1319, 1322 (11th Cir. 2024) (quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985)). Therefore, depending on the forum where the alleged speech occurred, the government may impose certain reasonable restrictions on speech. See id. It is undisputed that the School Board meeting is a "limited public forum," because it was created "for certain groups or for the discussion of certain topics." See id.; [Docs. 39 at 9; 40 at 9]. Though the School Board meetings are open to the public, the Public Participation Policy only allows speakers who are randomly selected by the School Board Chair to share remarks during the Public Comment portion of the meeting. See Compl. at 26. Alternatively, the Policy only allows speakers to address pending agenda items during the Agenda Item Participation portion of the meeting. See id.

inefficient but also could deny other citizens the chance to make their voices heard." Lowery v. Jefferson Cnty. Bd. of Educ., 586 F.3d 427, 433 (6th Cir. 2009). Thus, even assuming *arguendo* that Defendants Rechsteiner, Menard, Rich, Cushing, and DeWoody impermissibly removed Plaintiff because of her viewpoint, Plaintiff fails to state a plausible retaliation claim based on her removal because non-retaliatory grounds—i.e., her noncompliant and disruptive conduct—warranted her removal. See Nieves, 587 U.S. at 398; Youkhanna, 934 F.3d at 52; Jones v. Heyman, 888 F.2d 1328, 1329 (11th Cir. 1989) (holding that the chair of a city commission meeting may have a speaker removed when she becomes disorderly by speaking off-topic without violating the First Amendment); cf. Leonard v. Robinson, 477 F.3d 347, 361 (6th Cir. 2007) (reasoning that a reasonable officer would have probable cause to arrest a "recognized speaker" at a public assembly if the speaker is determined to be "out of order" by the chair of the assembly).

The third alleged adverse action—the Criminal Trespass Warning issued by Defendant Rich—fares differently. In response to that claim, Defendant Rich invokes the defense of qualified immunity. [Doc. 34 at 14–15]. "A defendant can assert the defense of qualified immunity at various stages, including, as here, in a pretrial motion to dismiss for failure to state a claim under Rule 12(b)(6)." Kirby v. Sheriff of City of Jacksonville, Fla., No. 22-11109, 2023 WL 2624376, at *3 (11th Cir. Mar. 24, 2023). "Qualified immunity shields government officials performing

discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. (cleaned up). If an official meets the initial burden of showing that he acted within the scope of his discretionary authority when he took an allegedly unconstitutional action, the burden shifts to the plaintiff to demonstrate the facts alleged in the Complaint support a plausible inference that (1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the alleged conduct. See D.C. v. Wesby, 583 U.S. 48, 63–64 (2018); Jackson v. McCurry, 762 F. App'x 919, 925 (11th Cir. 2019); Acosta v. Miami-Dade County, 97 F.4th 1233, 1239 (11th Cir. 2024); Kirby, 2023 WL 2624376, at *3.

For the first prong of the qualified immunity analysis, the Court assesses whether the Complaint plausibly alleges that Defendant Rich retaliated against Plaintiff because of the exercise of her First Amendment rights. Bennett v. Hendrix, 423 F.3d 1247, 1255–56 (11th Cir. 2005). As stated above, "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." Nieves, 587 U.S. at 398. If an official takes adverse action against someone based on her protected speech, "and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may bring a First Amendment retaliation claim. See id.

Here, taking the allegations in the Complaint as true and construing them in the light most favorable to Plaintiff, Plaintiff repeatedly remarked that Defendant Cromer should be arrested for permitting certain books in CCSD schools during the School Board meeting during the School Board meeting. Compl. ¶ 43; [Doc. 36]. Defendant Rich heard those remarks, and that same day, he issued the Criminal Trespass Warning, which warns Plaintiff that she may not enter any CCSD property without written permission or else she may be arrested. See Compl. at 28; id. ¶¶ 46–47. The Criminal Trespass Warning contains no expiration date. Id. ¶¶ 59–60. Consequently, although Plaintiff would like to attend and speak at future School Board meetings, she fears that she will be arrested and charged with criminal trespass if she enters any CCSD property. Id. ¶¶ 77, 79. Plaintiff claims that Defendant Rich issued the Criminal Trespass Warning in retaliation for her viewpoint and that the Criminal Trespass Warning is an adverse action because it "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." [Doc. 40 at 9, 14]; Bennett v. Hendrix, 423 F.3d 1247, 1254 (11th Cir. 2005).

Defendant Rich offers two arguments about why Plaintiff fails to state a retaliation claim based on the Criminal Trespass Warning. [Doc. 34 at 19–22]. Both are unavailing. First, Defendant Rich contends that Plaintiff's speech was not protected by the First Amendment because her conduct was disruptive. [Doc. 34 at 21–22]. However, while Plaintiff's conduct may have been disruptive, the

substance of her speech was nevertheless protected.[9] See New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) (explaining that critical statements—including "vehement, caustic, and sometimes unpleasantly sharp attacks"—on government and public officials are generally protected by the First Amendment"); Houston v. Hill, 482 U.S. 451, 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge [official] action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); Connick v. Myers, 461 U.S. 138, 145 (1983) ("Speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (cleaned up)); cf. Davison v. Rose, 19 F.4th 626, 637 (4th Cir. 2021) (explaining that "criticisms of [school district] staff are surely protected speech," even when the speech involves antagonistic behavior); Frenchko v. Monroe, 672 F. Supp. 3d 421, 455 (N.D. Ohio 2023) (explaining that protected speech and disruptive conduct may sometimes be one and the same).

---

[9] Notably, unlike Defendants' arguments about Plaintiff's removal from the School Board meeting, Defendant Rich does not argue that the Criminal Trespass Warning functions as a reasonable and viewpoint-neutral restriction on Plaintiff's speech. [See Docs. 33 at 19–20; 34 at 20–21]; McDonough, 116 F.4th at 1328. Further, Defendant Rich does not argue that he had probable cause or any other reason to issue the warning. [See generally Doc. 34]. Thus, the Court will not speculate or draw inferences about alternative reasons that Defendant Rich issued the Criminal Trespass Warning. Absent viewpoint-neutral justifications for the reasonableness of the Criminal Trespass Warning, it would be a heavy-handed determination at this stage to conclude that Plaintiff's speech was *per se* unprotected. See McDonough, 116 F.4th at 1328 (noting "that although reasonableness is a 'forgiving test,' it is not a meaningless one").

Second, Defendant Rich argues that the Complaint lacks any plausible allegations that he issued the Criminal Trespass Warning based on Plaintiff's speech because he purportedly "was not present in the meeting during any public comment prior to Plaintiff's outbursts." [Doc. 34 at 20]. However, the Court has no basis to accept this characterization of the facts. The Court cannot discern which specific officers were present during the meeting from the video. As a result, the Court must take the Complaint's allegations as true, see Baker, 67 F.4th at 1277, and the Court finds the Complaint sufficiently alleges that Defendant Rich was present when Plaintiff remarked that Defendant Cromer "should be arrested." Compl. ¶¶ 43, 46–47.

Thus, based on the temporal proximity between Plaintiff's speech and the issuance of the Criminal Trespass Warning, the Court finds that the Complaint states a plausible claim that Defendant Rich issued the Criminal Trespass Warning with a retaliatory motive. See Goldsmith v. City of Atmore, 996 F.2d 1155, 1376 (11th Cir. 1993). Additionally, the Court finds that the Criminal Trespass Warning "would likely deter a person of ordinary firmness from the exercise of First Amendment right." Bennett, 423 F.3d at 1254 (explaining that in the First Amendment context, the adverse effect "need not be great"). Finally, in the absence of Defendant Rich offering any justifications to the contrary, the Court finds that the Complaint permits a plausible inference that Plaintiff's speech caused the Criminal Trespass Warning.

See Compl. ¶¶ 75, 78. Therefore, the Court finds Plaintiff states a First Amendment retaliation claim against Defendant Rich in his individual capacity.

As to the second prong of the qualified immunity analysis, the Eleventh Circuit has held that it is "settled law" that "state officials may not retaliate against private citizens because of the exercise of their First Amendment rights." Bennett v. Hendrix, 423 F.3d 1247, 1255–56 (11th Cir. 2005). Further, controlling precedent establishes that "a restriction on speech constitutes viewpoint discrimination 'when the specific motivating ideology or the opinion or perspective of the speaker is the *rationale* for the restriction.'" Jackson v. McCurry, 762 F. App'x 919, 930 (11th Cir. 2019) (emphasis added) (quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)). Here, assuming at this stage that Defendant Rich had no other rationale for issuing the Criminal Trespass Warning than dislike of or disagreement with Plaintiff's critical remarks, Eleventh Circuit precedent squarely provides that such a restriction is invalid. See id. Similarly, assuming that Defendant Rich issued the Criminal Trespass Warning for no other reason than to retaliate against Plaintiff's viewpoint, such an act would plainly violate the First Amendment. See Bennett, 423 F.3d at 1254.

In sum, absent further factual development, "it is not evident from the allegations of the [C]omplaint alone" that Defendant Rich is "entitled to qualified immunity." Kirby, 2023 WL 2624376, at *3. Therefore, "the case will proceed to

the summary judgment stage, which is the most typical juncture at which defendants entitled to qualified immunity are released from the threat of liability and the burden of further litigation." Id. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's individual capacity claim against Defendant Rich regarding the Criminal Trespass Warning.

### D.    Fourteenth Amendment Procedural Due Process Claim

Plaintiff alleges that "CCSD has established no procedural safeguards to protect against the arbitrary and excessive deprivation of Plaintiff's rights to freedom of speech and right to address the Board on matters of public interest [and] to continue her employment as a substitute teacher for CCSD[.]"[10] Compl. ¶ 104. Specifically, Plaintiff claims that Defendants failed to provide her a pre-deprivation or a post-deprivation hearing.[11] Id. ¶¶ 105–06.

---

[10] Plaintiff also alleges that she was denied the right to vote in person at her voting precinct and to enter her child's school to speak with teachers, administration, or attend events because of the Criminal Trespass warning; however, this allegation is belied by her other allegations that a CCSD attorney provided a letter that allows Plaintiff to be present on CCSD grounds to cast her vote and attend her child's school events despite the Criminal Trespass warning. Compl. ¶¶ 58, 82. Thus, the Complaint does not state a plausible claim that Plaintiff has been deprived of the right to vote or to attend her child's school events.

[11] It is unclear from the Complaint and Plaintiff's response briefs whether Plaintiff brings her due process claim against Defendants Cromer, Rechsteiner, Poole, Jordan, Harmon, Menard, and Chapman, Hightower, Cushing, Rich, and DeWoody in their individual capacities. To the extent the Complaint could be construed as bringing such a claim against Defendants Hightower, Poole, Jordan, Harmon, Chapman, or Cromer in their individual capacities, the Court dismisses Plaintiff's claim as to those Defendants due to the lack of any specific allegations about them, as discussed supra Part IV.C.2.a. For simplicity, the Court refers to the remaining Defendants—Defendant CCSD and Defendants Cushing, Rich, DeWoody, Reichsteiner, and Menard in their individual capacity—as "Defendants" throughout this section.

A § 1983 claim alleging a denial of procedural due process requires allegations of three elements: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." J.R. v. Hansen, 803 F.3d 1315, 1320 (11th Cir. 2015) (cleaned up). Even where a plaintiff is deprived of a constitutionally protected liberty or property interest, the "procedural due process violation is only cognizable under § 1983 when the state refuses to provide a process sufficient to remedy the procedural deprivation." Collier v. Conway, 672 F. App'x 950, 952 (11th Cir. 2016) (cleaned up). Thus, to sufficiently allege a procedural due process claim, it is not enough for a plaintiff to claim that the state deprived her of a protected liberty or property interest. She must also allege the available state remedies to address the alleged deprivation are constitutionally inadequate. See Doe v. Valencia College, 903 F.3d 1220, 1234–35 (11th Cir. 2018) (finding no § 1983 procedural due process violation where state law provided a sufficient remedy to address plaintiff's alleged deprivation); Tinney v. Shores, 77 F.3d 378, 382 n.2 (11th Cir. 1996). "If adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." Cotton v. Jackson, 216 F.3d 1328, 1331 (11th Cir. 2000).

In their Motions to Dismiss, Defendants argue that Plaintiff has no plausible claim of any constitutionally inadequate process because Plaintiff "at all times could

have requested (but has no allegation that she ever did request) a review of the criminal trespass warning" or any other issues arising under her educator-related contract "under O.C.G.A. § 20-2-1160" by participating in an "1160 Hearing." [Docs. 34 at 22, 24; 33 at 21–22]. Defendants contend that 1160 Hearings provide adequate state procedures to address Plaintiff's alleged constitutional deprivations and that Plaintiff therefore cannot state a claim for deprivation of due process because she has not alleged that Plaintiff was denied an 1160 Hearing or that the process is otherwise constitutionally inadequate. [See Doc. 33 at 22–23].

In response, Plaintiff argues that she was not required to exhaust state administrative remedies as a prerequisite to bringing a § 1983 claim. [Doc. 40 at 16] (citing Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496, 516 (1982)). True, but Plaintiff misses the point of Defendants' argument and existing case law. While Plaintiff's statement is accurate for § 1983 claims in general, when stating a procedural due process claim, Plaintiff must allege that existing state procedures to remedy the alleged deprivation are inadequate or, if they are adequate, that the state failed to provide them. See Cotton, 216 F.3d at 1331.

Plaintiff makes no such allegations. Instead, in response to Defendants' Motion to Dismiss, Plaintiff merely raises a passing argument that any such attempts to participate in an 1160 Hearing would have been futile, given that she would have had to appeal to "the same Board that imposed the sanctions, including removing

Plaintiff from the [B]oard meeting, banishing her from school district property indefinitely, and firing her from her job."[12] [Doc. 40 at 16]. However, binding caselaw does not support Plaintiff's position. "[U]nlike substantive due process violations, procedural due process violations do not become complete "unless and until the state refuses to provide due *process*." McKinney v. Pate, 20 F.3d 1550, 1562 (11th Cir. 1994) (abrogated in part on other grounds). For instance, in the case of an employment termination case, "due process does not require the state to provide an impartial decisionmaker at the pre-termination hearing. The state is obligated only to make available the *means* by which the employee can receive redress for the deprivations." Id. (cleaned up and emphasis added). Thus, even if a plaintiff suffers a procedural deprivation at the hands of a biased Board at her termination hearing, she does not suffer a *violation* of her "procedural due process rights unless and until the [Board] refuses to make available a means to remedy the deprivation." Id.

Under Georgia law, the School Board "shall constitute a tribunal for hearing and determining *any matter* of local controversy in reference to the construction or

---

[12] In support, Plaintiff cites two ERISA cases for the proposition that "district courts have discretion to excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate" or when "a claimant is denied 'meaningful access' to the administrative review scheme in place." [Doc. 40 at 16] (quoting Counts v. Am. Gen. Life & Acc. Ins. Co., 111 F.3d 105, 108 (11th Cir. 1997) and Perrino v. S. Bell Tel. & Tel. Co., 209 F.3d 1309, 1316 (11th Cir. 2000)). These cases—which squarely concern the exhaustion requirements for ERISA actions—are plainly distinguishable and inapplicable to the instant case.

administration of the school law, with power to summon witnesses and take testimony if necessary." O.C.G.A. § 20-2-1160(a) (emphasis added). Further, "[a]ny party aggrieved by a decision of the local board rendered on a contested issue after a hearing shall have the right to appeal therefrom to the State Board of Education." Id. § 20-2-1160(b). After a decision by the State Board, any party "may appeal to the superior court of the county wherein the local board of education is situated." Id. § 20-2-1160(c). While Plaintiff did not necessarily need to exhaust these procedures to state a procedural due process claim, she did need to allege that Defendants either failed to provide such procedures or challenge them as constitutionally inadequate. Because the Complaint alleges neither, Plaintiff fails to state a claim that Defendants violated Plaintiff's procedural due process rights. See Dyer, 426 F. Supp. 3d at 1364. Accordingly, the Court dismisses that claim.

## V.    Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants Cromer, Reichsteiner, Poole, Jordan, Harmon, Menard, and Chapman's Motion to Dismiss [Doc. 33]. Therefore, the Court **DISMISSES WITH PREJUDICE** Plaintiff's claims against those Defendants.

Next, the Court **GRANTS IN PART AND DENIES IN PART** Defendants Hightower, Cushing, Rich, DeWoody, and CCSD's Motion to Dismiss. [Doc. 34]. Specifically, the Court **DENIES** Defendants' request to dismiss Plaintiff's First

Amendment retaliation claim against Defendant Rich in his individual capacity regarding the Criminal Trespass Warning. The Court **GRANTS** the motion in all other respects. Accordingly, the Court **DISMISSES WITH PREJUDICE** Plaintiff's claims against Defendants Hightower, Cushing, Rich, DeWoody, and CCSD. The Court also **DISMISSES WITH PREJUDICE** Plaintiff's claims against Defendant Rich except for the First Amendment retaliation claim against him in his individual capacity.

Finally, the Court **ORDERS** Defendant Rich to answer the Complaint in 14 days.

**SO ORDERED**, this 30th day of May, 2025.

Eleanor L. Ross
United States District Judge
Northern District of Georgia